May it please the Court, I'm Philip Ross, and I represent Int'l & American President Lines, and I'd like to reserve five minutes of my time. As your Honors know, this is the second time that APL has had to come before you in connection with its OMRA Section 303 case against the Union. And I suppose that's not entirely surprising, because secondary boycott law in general, and Section 8E in particular, has been aptly described as one of the most complex areas of labor law. In now its second attempt to grant summary judgment to the Union, we submit the District Court once again got its ruling wrong, and we ask this Court to again reinstate APL's action. In the few minutes that I have available this afternoon, without intending to abandon any of the other arguments made in APL's brief, I'd like to focus my remarks primarily on one ground that APL raises in this case, and that is that a tribal issue exists that has applied to Samson, Tug & Barge, the Union urged and the arbitrator adopted an interpretation of the AALA, the master contract, as a prohibited Union signatory agreement, and by so doing, the Union engaged in unlawful secondary activity and violations. Tell me what that means, prohibited Union signatory agreement. The law is clear that a Union signatory agreement, one which focuses on Union affiliation, and which prohibits an employer from subcontracting work to another employer who's not signatory to some Union contract, violates Section 8E. This Court recognizes much in its original panel decision. And second, that the Union's pursuit of a grievance in arbitration to secure a Union signatory interpretation of a collective bargaining agreement is considered coercive activity in violation of NLRA Section 8B4 IIA. And this panel again directly recognized that in its earlier decision. Now in responding to the Union's latest summary judgment motion below, APL presented evidence that through the arbitration process, the ILWU sought an interpretation of the AALA, under which Samson, who's currently doing the disputed work, could be considered a permissible subcontractor of APL if it agreed to become signatory to an ILWU Union contract, but critically, not the AALA contract, and then use ILWU longshore labor. That we submit is a classic prohibited Union security agreement. The Alaska arbitrator adopted the Union's position and interpreted the AALA as requiring APL to only, as requiring the sewered work to only be performed by ILWU Union labor. Mr. Ressa, let me make sure I understand what you just said. As I understand it, there is a master agreement, which is the AALA. Correct. And then is there another agreement that APL has signed? Not that APL has signed, but what the arbitrator determined is that Samson could be considered a permissible subcontractor if it signed a Union compliance agreement. A compliance agreement is a separate and distinct Union contract from the AALA master agreement. A compliance agreement is one where an employer agrees to conform to some, but not necessarily all of the terms of another contract. In this case, presumably the AALA. But what the arbitrator said was that Samson did not have to become signatory to the AALA, didn't have to become an employer party to the AALA. It would be sufficient if it became signatory to this different Union contract. So this would presumably be a contract between Samson and Unit 60 for the work in sewers? Correct. Is that it? Correct. And that contract might include a requirement that Samson pay at Union wage scales, and would it have to make contributions to the pension plan? Depends on what that contract, once negotiated and agreed to, would include. But there is no claim that Samson currently is not paying prevailing wages. But wouldn't it also, well, I guess by the virtue of the fact that it would sign the contract, it would have to use ILWU Longshoremen for the work, right? It would certainly presumably do that. Can you explain to me, it was very odd, why did MEBA, what's the word, disclaim the work? I can't put myself in the mind of MEBA and what internal Union agreements that they may have come to with respect to other areas of the country. That would be, I realize that's not a party before us, but that would on its face appear to be the breach of the implied covenant of good faith and fair dealing with regard to its own employees. I can't speak to whether what MEBA did. Well, I guess I'm asking you a hypothetical. Hypothetically, what I believe happened is MEBA agreed to give up certain jurisdiction in sewer in order to get something it wanted from the ILWU elsewhere. Yeah. Mr. Ross, you started your discourse here by, I think you said that there was a contrary issue of fact, and so for that reason it was error to grant summary judgment, at least one of the reasons. There is a, there is a. Is there an issue like that? There is a disputed issue of fact, but that goes to a separate and different issue. So far, I haven't heard you mention any. Well, there are two different. I'm sorry. There are two different grounds that APL has raised for liability here. One is the double A, double IA argument, which is the union signatory argument. There's a second argument that we say that the union has also violated a separate provision, double IB, which is whether or not the union acted with a cease doing business with objective as opposed to a work preservation objective. Now, that issue has nothing to do with the first one. In fact, the sort of dual concepts of whether or not the union had a colorable argument that the work was fairly claimable and that APL had a right of control, that all goes to the double IB issue. It doesn't go to the union signatory issue. Your position is that the union would have to prevail on both of these in order to sustain summary judgment. That's correct. All right. Go ahead. So is the answer to Judge Tashima's question. There is one, but it's with. Let me finish the question. I apologize. You can answer it. I apologize. No problem. Is the answer to Judge Tashima's question, the disputed issue of material fact, is over the question of whether APL controls the work? It goes to whether APL controls the work and it was fairly claimable. Well, so really. I'm sorry. It's a part of the same question. Is it fairly claimable? Yes. I mean. Which is the double IB issue. So what Judge Tolman just posited, in other words, whether or not APL controls the work is sort of a sub-question of the other question? It's one of the two factors that would be considered in the double IB. It's a two-prong test, right? Correct. The first prong is whether or not it's fairly claimable work. Correct. And the second prong is whether or not APL as the employer controls that work. That's correct. But it seems to me your argument is before we even get to that. That's correct. Those are arguments you're going to make second, but your first argument is we don't even have to apply the factors. That's correct. Because it's somehow illegal. Right. What they did. That's correct. That's what I understand. The union signatory argument, the double IA argument, doesn't deal with those factors. So under the union signatory argument, SAMHSA, if it signs this separate union contract, can be a permissible subcontractor. If it doesn't sign this separate union contract, the compliance agreement, then it can't be a permissible subcontractor. That's a classic union signatory agreement. And theoretically then APL would not be able to continue using SAMHSA to handle that work at Seward under the arbitrator's ruling. That's correct. Unless SAMHSA agreed to sign this other contract. But if SAMHSA won't agree, then APL is going to have to find somebody else to do the work. We're not challenging the underlying arbitration agreement. We're seeking our damages for the union forcing us to pay double. But it seems to me that the argument against your argument you're now making, and that's why I'm asking it, is that you're approaching this from an employer's perspective rather than the union's perspective. Well, respectfully, Your Honor, I think I'm applying it from the legal perspective. Well, I understand what your argument is, but I was trying to understand their argument back to you. Maybe I'll let them make it. And frankly, I don't think the union has actually ever responded to our union signatory argument as it applies to SAMHSA. They argued that this issue of whether or not the primary bargaining unit that APL is a part of is either the total AALA unit of all employers, both the AMEA multi-employer members or the individual members, it doesn't matter with respect to the union signatory argument for SAMHSA because SAMHSA is not being asked to become a party to either the AMEA multi-employer unit or the AALA master agreement. They remain completely outside the AALA agreement. So whether the primary bargaining unit that APL is a member of is the AMEA, as APL suggests, or the larger AALA, as the union argues, is irrelevant with respect to SAMHSA because SAMHSA is not being asked to enter into either one of those. From the union's perspective... But as I understand it, even as interpreted by the arbitrator, the agreement would merely require, if you will, the loading and unloading of the containers owned by an AALA signatory to be performed by the labor. But the arbitrator also says that SAMHSA can continue to perform the work if it signs a compliance agreement, which is not the AALA agreement. If SAMHSA signed a compliance agreement and hired ILWU labor, that ILWU labor would be part of a SAMHSA bargaining unit. SAMHSA would have its own contract with the ILWU. It would be part of a SAMHSA bargaining unit. That work would not be done under the AALA. If SAMHSA chose to hire, on a temporary basis, on a particular job basis, individuals out of the union hiring hall, when they were dispatched out to SAMHSA to work under SAMHSA's compliance agreement, they would be part of the SAMHSA collective bargaining agreement. If those same workers were dispatched out on other occasions to AALA members, they would then be working under the AALA bargaining unit. But what the union is seeking to do here is it's seeking to benefit its members generally. Yes, the union signatory concept that they've advanced would probably provide an additional economic benefit to union members because it would give them additional work in the separate SAMHSA bargaining unit. But the law is clear, and the Ninth Circuit's earlier decision in the Pacific Northwest chapter of Associated Builders and Contractors makes clear that if the union is seeking to benefit its members generally, as opposed to seeking to benefit its members in the primary bargaining unit, the AALA bargaining unit, that's unlawful and that's secondary. And that's what we have here. They're trying to create a separate bargaining unit and give their members additional work, but that is an unlawful union signatory provision because if SAMHSA doesn't agree to do that, then they can't be a permissible subcontractor, but they can if they sign this separate union contract. And I see I have 2 minutes and 30 seconds left, and I'd like to resume my time if I could. Okay, we'll hear from Ms. Maglio. May it please the Court, Emily Maglio for Appellant, ILWU Unit 60. So the G is silent, it's Maglio? Yes. Okay, thank you. I want to jump right into this idea that the union had an object in prosecuting its grievance of obtaining a compliance agreement and also that the arbitration award itself ordered SAMHSA to enter a compliance agreement. Both are contradicted by the undisputed record evidence in this case. The sole evidence that APL relies on to argue that the union had an object of obtaining a compliance agreement is at ER site 533-34. This is testimony from Charles Wendt where he responds to a hypothetical question in which he was asked, if SAMHSA were an AALA employer and hired longshoremen to perform the disputed work directly, would the union have a claim for lost work against APL? Notably, this testimony is not about the union's object of the grievance, it's not about interpreting the arbitration award, and moreover, it's simply not about obtaining a compliance agreement. Rather, it concerns whether SAMHSA, in this hypothetical scenario, was an AALA employer and thereby consented both to the Alaska-wide bargaining unit and to the provisions of the contract that require the assignment of all bargaining unit work to the LWU workforce. Counsel, can you help me? I've been looking at Mr. Swanson's both his bench decision and his arbitration decision, but I'm not finding the three options that he gave to American President Wines. Can you direct me to the record where I can read that language? Yes. I thought I read his language to support the argument that Mr. Ross was just making. So the language is at ER site 730. Okay. And I want to, the arbitration award itself simply orders APL to assign work covered by the contract to its workforce, Longshoremen, the Port of Seward. Okay, I want to stop you because I want to focus on ER 730 at subparagraph A of paragraph 5 of Mr. Swanson's decision or conclusions from the record. He says that Samson can sign a compliance agreement with the AALA and hire ILWU directly. We know from the record that Samson was asked whether it would agree to do that, and it refused to do so. So why isn't that a union signatory clause that's illegal under the Act? It would be if the arbitrator ordered APL, if that were the only way that APL could comply with its award. Here, this section of the arbitration award is dicta, and further, it is actually an impossibility for Samson. Well, wait a second. He says there are several ways this work can and must be accomplished in the future with Longshore personnel. What's dicta about that? I read that as a direct order to APL. You've got three choices, A, B, or C. And if it chooses A and Samson refuses, why isn't that a union signatory agreement in violation of the law? At the next page, he indicates that this is an employer decision. So he is not ordering APL to engage and to get Samson to enter a compliance agreement. But they only have three choices. And I believe, is it Mr. McCarron, is that how the general manager pronounces his name? I believe so, yes. Okay, Mr. McCarron testified that for whatever reason, it's not possible to have Eagle Marine do the work. And I guess his client says, I want to use Samson, but they can't use Northstar or SES. So at that point, what does APL do? It can't do any one of the three that the arbitrator ordered it to do. Well, first I just want to note that it's actually an error in the arbitration award. What's an error? That a compliance agreement is available. As set forth in ER site 175 to 76 and 178, this is evidence that APL submitted in opposition to summary judgment, the parties abolished, prohibited compliance agreements to the AALA. Do we now have a contested issue of material fact over whether or not there is or is not a union signatory clause? No, I do not believe so. Because there are two factors here. Well, why not? I mean, APL is telling us we can't comply with A because it breaches the law. You're saying, well, but earlier in the litigation they disclaimed doing that. Why isn't that a contested issue of material fact that a jury is going to have to decide? Because the evidence is undisputed that the parties abolished or prohibited compliance agreements. But that is a dispute over that fact. Am I missing something? I'm listening to your argument, but the more I think about it, the more I think, well, a jury is going to have to resolve this. Perhaps if I can take a step back. Okay, go ahead. In order to have a claim under Section 303, APL must show that there's a disputed fact as to whether the union had an unlawful object to obtain a union signatory interpretation. Here, there is no evidence that the union had such an object. As I just explained, the testimony from Mr. Wendt does not support such an object. Further, the union's arbitration brief at ER Site 141 simply argues that APL must assign work under its control to the longshore workforce. But this goes to the control issue, does it not? I mean, I'll give you, for my hypothetical, the assumption that there was a legitimate objective to try and preserve work here, but that's only the first prong, isn't it? The union also has to establish that the employer controls the work. Right, that is for the work preservation test, that's correct. Right. And all three of these directives at ER 730 look to me like they are directed to an employer who controls the work, and it tells them here are three different ways that you can accomplish the work, but it implicitly assumes that APL is the employer who controls it. Yes, and I think that it is a finding that APL does control the work. And APL says we don't control the work. It's SAMSUN that controls the work. Did really APL argue that they don't control the work? They argue that they don't control the work. However, that is contrary to a Supreme Court precedent in the ILA cases and in the Calcartage cases, which finds that carriers have the right to control work on their containers. So the facts underlying the right-to-control test are undisputed. When you say they're, go ahead. The only reason I ask you that question, it seems like APL's argument is not we do not control the work, but it is whether we control it or not, the very fact we have to do it violates the code. I mean, they're saying even if we went and forced SAMSUN to do something or even if we did something else, it's a violation nonetheless. It doesn't seem to me they're arguing we don't control. All they're arguing is even, doesn't matter whether we control or not, if you're going to force us to do this, you violate the act. Yeah, and by this you mean the compliance agreement. Right. Yes. Sorry, I said act and I meant compliance agreement. And I think that is a fair assessment of what APL's argument is here. But in order for there to be a 303 claim, there needs to be evidence in the record that the union had an object of obtaining a compliance agreement, and there is simply no evidence in the record that the union had that object. The brief which I just referenced at ER 141, testimony from the former president of the Alaska Longshore Division at ER Site 180. And who is that? What's his name? Carl Norman. Carl Norman. At what point does he suggest that one way that APL could comply with the agreement would be to enter a compliance agreement? And the fact that the parties agreed to abolish compliance again, prohibit them, makes it even an impossibility that the union could have had such an object. I'm trying to get at this because this is a very difficult law, I'll be fair, for me to apply. But it seems to me that bartenders illustrates a point which I am trying to understand. The agreement in bartenders was that the case was found to be unlawful because it was aimed not at altering the employer's labor practice but expanding the union to the employer's lessees. But we were still required under bartenders to apply the factors as I understand it. Yes, we do not dispute that bartenders sets forth the legal standard for when there's a union signatory agreement. And I think what is important here is the workforce at issue, we're not expanding the workforce to another, we're not trying to reach out to another workforce. Rather, what we're doing here is... But isn't this work that's currently being done by MEBA employees? It is currently being performed by MEBA, yes. So why doesn't that make it extending work that's being done by members of another union? The principles set forth in the ILA cases in Cal Carthage, when you have a work preservation agreement, a work preservation interpretation, you need to look at the work of the bargaining unit. And here that is the Coast Wise Longshore Bargaining Unit, not the work of others. In fact, in the Cal Carthage cases, in order for the employers to comply with the work preservation agreements, and also the ILA cases, many employers were going to go out of business, many teamsters were going to lose jobs as a result of the transfer of the work. But the Supreme Court cautioned that you cannot look at those losses to those external employers and external employees. Rather, the focus needs to be on the work of the bargaining unit. I also, just to go back to the arbitration award, in Douglas Aircraft, which is a case that we cited in footnote 10A to our brief, sets forth that if a labor arbitration award has possible two interpretations, one lawful and one unlawful, the board and courts are obligated to interpret that award in a lawful manner. And the reason for this is to promote the federal policy of encouraging labor arbitrations and also to avoid discouraging labor arbitrators from writing written opinions. The facts of that case, I think, are particularly helpful here for the problem that we were discussing earlier. In that case, the labor arbitration award had two possible interpretations. One gave two reasons for denying back pay to an employee. One was clearly lawful. The other was clearly unlawful. The board interpreted those reasons such that they were cumulative or, in other words, that the unlawful reason was a but-for cause for the denial of back pay. This court, however, rejected that contention and found that where an arbitration award has two possible interpretations, the burden and the obligation of the courts is to interpret it in a lawful way. So how do I factor in NLRB versus hotel and restaurant employees and bartenders, which I was saying bartenders, when it says in general union signatory agreements, agreements that require using union labor, are generally viewed as an effort to expand the union's sphere of influence by impermissible secondary pressure? Yes. In that case, there was a unit of employees who worked directly for the employer. And the employer subcontracted out, I believe it was, its coffee shop to another company. That's right. And so at that point, the workers that the union was trying to affect were not the bargaining unit. They were workers outside the bargaining unit. Here, the traditional work and the nature of the longshore bargaining unit is such that the workers that we are trying to preserve jobs for are the same workers who work for APL and work for all of the AALA employers collectively. This is not reaching out to another group of employees. This is the interpretation that the union sought here only seeks to preserve work of the bargaining unit. Unit 60 is the Dutch Harbor unit. Is that right? Yes. Oh, no. Unit 60 is in Seward. What? Is in Seward. Seward, right. Now, is there other work for Union 60 besides either APL or Samson? Yes. Well, Unit 60 does not work directly for Samson. Is there other work in Seward? Seward, yes. There is? Yeah, the longshoremen at Unit 60 work for both North Star and Southeast Stevedoring. In addition, though, the bargaining unit is not just Unit 60, which is essentially a local unit. The bargaining unit is covered by the contract as Alaska-wide, so it includes 14 ports. And it includes— So the bargaining unit is all Alaska? Yes, all Alaska. And this is set forth principally— if you look at the Alaska Steamship case that we cite in our papers, that sets forth what the AALA bargaining unit is, and that is the NLRB unit clarification decision. And there, the bargaining unit is clearly defined as the pool of longshoremen who perform work covered by the contract at any location covered by the jurisdiction of the AALA, so that is Alaska—or at the 14 ports that are covered by the contract. I have a minute left. Actually, I'm going to let you go over because you're the only case we've got on the calendar. I want to make sure you have enough time to make your points. Yes. The one thing I did want to also flag just as a conceptual point is, while true, APL is bringing two claims, one for a union signatory and one a cease-doing business, the underlying facts that support why the district court got it right when it granted summary judgment for the union are overlapping, and the analysis is overlapping. And that is because the reason why this is not a union signatory interpretation but is rather a lawful no-subcontracting interpretation is based on the nature of the longshore unit. And because of the nature of this unit, it includes the primary employer is not just APL but rather is all AALA employers. And that is set forth and particularly well in the community container case. But does it matter? I thought that the law basically gives the—and I think we talked about this in our prior opinion— the right to bring a 303 action to either a primary or a secondary employer. Oh, yes, that's true. I'm not contesting that point. But what matters for the analysis of whether this is a union signatory agreement is who is the primary employer. And here, because we have this single integrated workforce, there is one primary employer, and that is all of the AALA employers collectively. And do they have a name? I'm sorry? Do those—I mean, it's like in other contracts we have the PMA. Do we have another name for the group in Alaska? In Alaska, two are part of an association and two are not part of an association, and that just basically defines who can sign the contract on their behalf. They still bargain one contract and agree to a one integrated bargaining unit. They set up one system of registration that applies regardless of which employer. Are we talking about the AMEA? Is that what we're talking about? Yes, that's the current association. But there also are two other AALA employers. Those are North Star and Southeast Stevedoring. And that contention—those fundamental legal principles not only show that the district court was right on the union signatory interpretation, but also show that the district court was right in finding that the work was fairly claimable. Because what you need to look at for a fairly claimable analysis is the traditional work patterns of the unit. And you look at those based on a variety of factors, including what work is covered by the contract. And here we also have an interpretation by the arbitrator that the work at issue is covered by the contract, as well as the Alaska Steamship Decision and the practice and the history of the performance of this work. And here the undisputed record evidence shows that APL hires Longshoremen directly to perform the very same work, loading and unloading of containers off of— This is where, when you say APL does it directly, where? In Dutch Harbor. In Dutch Harbor. Dutch Harbor, yes. And also— But not in Seward. Yes, in Seward, Northstar had hired Longshoremen to provide this work as well, loading and unloading of containers. I mean, the work at issue here is—it's the definition of what Longshore work is, the loading and unloading work of cargo. I don't see that as a—I don't see any dispute over the nature of the work. Where I'm having a hard time following your argument is I read in the testimony in front of the arbitrator that while it may be true that Northstar had used ILWU in the past when it handled containers for APL, that APL didn't enter the Seward market until some time later. I can't remember the date, 2003, 2005, something like that. And at some point, they started using SAMSUN as its connecting carrier from Dutch Harbor, and SAMSUN has MEBA employees, not ILWU. And I'm still—maybe you can help me explain. Why did MEBA disclaim this work if their employees were doing it on behalf of SAMSUN? Again, I can't testify or explain what was going on in their heads, but I imagine it's because this is traditional Longshore work. And this is where— You mean MEBA doesn't organize any Longshore workers? Is that what you're saying? No, they do not. Longshore work in Alaska— Are they having engineers do the unloading? Pardon? Are they having engineers doing the unloading? Yes. Is that what the record shows? Or you just know that— Oh, the record shows— You just know that MEBA only has engineers. Yeah, MEBA does not hire or include within its unit workers who are Longshoremen. The only Longshoremen— But they are, to this day, doing Longshore work for SAMSUN. Yes, they are. But what matters is that APL controls that work, and they control— That's the question. Now, tell me why they control that work. Okay. Well, no, no. Tell me why it's an uncontroverted fact that they control that work, they meaning APL. Based on the Supreme Court precedent in the ILA cases as well as in CalCartage, carriers have control work for basically two general concepts. First is that carriers are intimately associated with the employment of Longshore labor, and that's the case even though they typically subcontract work out to terminal operators and stevedores, and also because of the unique relationship that carriers have as common carriers over their containers, and these include that they own and lease their containers, that they control the use of their containers, that they provide for the loading and unloading of their containers, and that they prescribe the conditions of release of their containers. But I thought there was testimony from the general manager of Alaska operations that even though the containers may be painted with APL flags on the side of the container, that there were occasions where, in essence, they, I don't know if the word is leased, or allowed their containers to be used by others, and the containers would be filled with goods belonging to some other shipper and moved around until APL needed the container back. Is your position that when it is being used by another shipper, let's say in Seward, that APL still controls that work by whoever is stuffing the container? Under the ILA cases in Carthage, because the carrier controls the, prescribes the condition of release of their containers, they do control the work, but ultimately... There's testimony to be, you know, maybe APL has 50 empty containers sitting on the dock at Seward that their frozen seafood customer can't use for the next month. And so somebody else comes along and says, we'd like to use those containers, and presumably APL will, for a fee, let them do that. So is your position that at that point APL still controls the work? That is our position, but I want to be clear that that testimony does not relate to, is not material to resolving the disputes at issue in this lawsuit. That all concerns pre-2003, that is before... Well, I thought the testimony was that we hire Samson as our connecting carrier, and yes, it is true that ILWU longshoremen load and unload the containers in Dutch Harbor, but once it is on Samson's barge, bound for Seward, it's Samson and its employees who handle the containers there. Yeah, so... How is APL controlling the work in Seward if it's Samson MEBA employees who are doing the work? Because APL has the ability to choose to hire Samson or not, and also to choose to set the terms and conditions of the use of their containers. But again... But if the term and condition is, as the arbitrator ordered, that you can only use Samson if it agrees to use ILWU labor, why doesn't that violate the union signatory clause? That is a possible, or perhaps a possible interpretation of the arbitration award, but to have a claim for Section 303, there needs to be evidence in the record that the union had an object to obtain such a compliance agreement, and there is simply no evidence in the record to support that. Well, the only thing we know for sure is that under the arbitrator's award, at the request of the ILWU, APL is now paying double. They have to pay these time cards for all the work that MEBA employees are doing. APL has to pay as if the work were being done by ILWU employees, and that money then goes to the ILWU and its pension plan and so on. It goes to ILWU employees. That, as I understand APL's position, is the damage that APL has suffered if there is liability under 303. That's correct. Okay. And the only way that APL can avoid continuing to incur that damage is to convince SAMHSA to use ILWU employees or to do the work itself. Yes. Right? It's to do the work itself. It's not because the parties have abolished a prohibited compliance agreement, they can't actually convince SAMHSA. When you say they've abolished a prohibited compliance agreement, there is no compliance agreement right now, right? That would require some sort of a contract to be entered between SAMHSA and the ILWU, right? In the 1999 contract and going forward in the contract that's at issue here, the 2004 contract, the parties prohibited employers from entering compliance agreements. They agreed that, I believe at the urging of APL, that such contracts are not appropriate and employers who are not signatory to the AALA cannot hire employees out of the dispatch halls. So the interpretation or the suggestion of a possible way to comply by the arbitrator is actually just false. And it's further not something the union ever sought to obtain throughout the process of the grievance. I thought Mr. Wendt testified that if they'd use our labor, then we'd drop the whole time card grievance. Right. So he testified if SAMHSA became an AALA signatory. So that's a hypothetical scenario, and it also is not discussing the object of grievance. Well, the union had filed a grievance prior to the round of negotiations, had they not? I thought there was a pending charge or grievance that had been filed by the union. Right. That is true. The deposition testimony, though, took place long after this lawsuit was filed, the deposition, and it was in response to a hypothetical question. But I guess I'm getting back to this issue of control. Why isn't all that evidence relevant to the issue of whether APL controls the work? I'm sorry, which evidence? The evidence that we're talking about with the time cards and here's how you avoid liability. It is evidence that APL has control. The fact that APL has the ability, they may not want to, they may think it's expensive or not in their business interest, but that's the cost of entering the contract. They can hire a longshoreman directly. They can bring a manager or supervisor to Seward so that they can hire a longshoreman directly to perform the work at issue. How does bringing a manager to Seward solve the problem? You still have to use ILWU longshore workers, do you not? Right, and they would employ them directly. And the modification to the agreement. Oh, I see. But that doesn't help them get the containers from Seward to Dutch Harbor and back because they don't have their own tug and barge fleet. Right. So this would require a modification of its contract with Samson so that APL would be able to perform the work directly itself. But they don't want to do that. Samson said they don't want to hire longshoremen directly. This would be APL hiring longshoremen. You mean in chartering Samson barges and tugs? Is that what you're talking about? Yeah, they would pay for the services from Samson to take the containers from Dutch Harbor to Seward. But not to actually touch the boxes. Right. And as a carrier, they have the control and the ability to set those arrangements. Basically, a Samson tug and barge would pull up. They would tie the barge up to the dock. The Samson employees would go home or have lunch or whatever they're going to do. And then ILWU workers would come on board the barge and start moving the cargo. Yeah, exactly how they perform the work in Dutch Harbor. I think we understand. Anybody have any further questions? Okay, Mr. Ross, I let her go over so we'll give you a little extra time. Thank you, Your Honor. Thank you. Thank you, Your Honor. Just a couple of points. First, I do think the union is taking a deliberately narrow view of the evidence when they suggest there's no evidence what the union's object was. And I think Your Honor pointed it out in Mr. Wendt's testimony. And I would just direct the Court's attention to— Well, let's go to the control issue.  Is it APL's contention that they do not control the work? It is APL's contention that they do not control the work. Where is the evidence of that? And where is the argument? Because I looked all over for that. It seemed to me that your argument is even if we could go to Sampson or whoever we needed to do and do what you're suggesting, even if we could, doesn't matter, you violated the agreement. And you're right as well, Your Honor. And you're both right because we're talking about two different sections here. And we're talking about the union signatory section, double A, double IA. That only—my suggestion here only applies to the first argument you made today. That's correct. So where is your evidence that you don't control then? Okay. So we don't—the right of control as it's defined under NLRA law is not the right of an employer to cease doing business with another contractor. If that was the case, then the second issue of the two, fairly claimable right of control, would simply mean an ability to accede to the union's cease doing business with intent. That's not how it's applied. And if you look at the Nevins Realty case, that explains it. Well, I understand. My only worry is I'm here on summary judgment. So I've got to find, if you will, that evidence which is contradictory to the evidence in the record that you don't have control. And the evidence is that the work that Samson's cargo handling employees, who are currently MEVA employees, the work that that has been done has always been at the control and sufferance of Samson. Samson was the one who decided back before 2003, before APL even entered the Seward market, that it would use Northstar. It later changed its mind. Samson later changed its employment hiring practices to instead use its own directly employed workforce, who are represented by MEVA. Samson is the only party who has the ability to decide whether or not Samson will continue to use its MEVA represented employees or will go back to using Northstar. APL cannot force Samson to change its employment practices. The only control that APL has here is an ability to cease doing business with Samson. With Samson. And that is not a right of control as defined under NLRA law. And again, we would direct the court's attention to the Nevins Realty case. Well, just a minute now. Your opponent said one of the options is to undertake the work yourself. It is. The arbitrator said there are three ways that you must do this. Well, then, is there, doesn't that mean you have control? It means we can take the work away from Samson unless Samson. It's your containers. But we can be forced to accede to the union cease doing business with objective. We don't think that that's the right of control as it's defined under NLRA law. The arbitrator gave three. You're saying when she said, well, you know, you can do the work yourself, meaning the long short work, she's mistaken as a matter of law? That we can. I mean, in other words, that that right gives you amounts to the right to control the work? We don't think that's how the right of control is defined. By taking the work away from an existing subcontractor. We think that would be acceding to the cease doing business with intent. How do you get that? This all goes to the double I. How can you ever control work without taking it away from somebody? Well, you. How do you control without doing that? An employer can control work if it has the ability to decide. Who does it? Who does it? But here we don't have the ability to decide who Samson is going to use. So that's not the same as who does it. I mean, either Samson does it or you do it. Or it doesn't get done at all and we leave the market. I mean, those are all options. Why would we make that decision? Why couldn't it hire Northstar? Right. Aren't they a tug and barge company? No, Northstar is not a tug and barge company. There's no other tug and barge company that has IOW employees? None. So if APL wants to move its containers from Dutch Harbor to Seward, Samson is the only choice it has? If it's going to move containers by water. The only other choice is they could move them over land by truck. That's in the record? That's the Teamsters. Is that in the record? Yes, that is in the record. And that's Horizon, right? That's correct. And they're Teamsters? Correct. In National Woodwork, it says, which I now quote, however severe the impact of primary activity on neutral employers, it is not thereby transformed into an activity with a secondary objective. So I said to myself, well, based on that, just because APL has to cease doing worse with Samson, how does that offend AB4b, little i? It doesn't seem like it does. So long as the IBLW's objective was to preserve the work it had done in the past. Well, Your Honor, except for that. I mean, if I read National Woodwork and I read what it says here, then I'm having a tough time, if you will, swallowing your argument that just because you have to quit doing business with Samson that it's somehow been offended. Well, Your Honor, if that was the case, then the second requirement is a nonexistent requirement. It simply says that if a union wants to force an employer to cease doing business, the employer can always accede to the union and cease doing business, and therefore it has a right of control because it's been cowed by the union. That's not how it's defined. And, again, we would ask you to look at Nevin's Realty, which has been approved. And, again, this all goes, as you said, Your Honor, to the IIB issue, but it doesn't have any applicability to the IIA union signatory issue where you've got an unlawful contract. You've got a contract as interpreted and as sought by the union which says Samson gets to be a permissible subcontractor if it signs this separate agreement, but it doesn't if it doesn't sign the separate agreement. That is a classic union signatory contract, and this is a unitary summary judgment motion. If part of it isn't proper, the whole thing has to be sent back. And, also, I would point out the union said again and raised apparently as an issue its belief that APL containers were handled by Northstar before 2003. That is a material dispute. If the union considers that to be important and it keeps mentioning it, that is a material disputed fact, and, indeed, if you look at the district court's order granting summary judgment, I believe it's split note three, it recognizes that's a disputed issue. And if that's a disputed issue of fact, the summary judgment has to fall given that disputed issue. Mr. Ross, this may be a totally irrelevant question, but I just need to understand your answer about SAMHSA being the only choice that APL has. What was Horizon going to do? They were going to move the containers from Seward to Anchorage or from Whittier to Anchorage? It was from Seward to I believe it was Anchorage. It was on the south coast of Alaska, and they would truck it there. But I don't understand how that solves the ILWU problem. It doesn't solve the ILWU problem. Containers still have to come from Dutch Harbor to Seward and get loaded and unloaded at Seward, right? No, the containers would come on chassis, on trucks,  connection between Dutch and Seward. So the containers would go, empty containers would go by truck from Anchorage, I believe it's Anchorage, to Seward. They would get loaded by the customer. They would then get back on the truck, get trucked back to Anchorage, and then would get shipped by sea from Anchorage to Dutch Harbor. So Seward as a port no longer is used at all. The shipping part of it would be from Anchorage to Dutch Harbor, and there's no dispute as to any of that work. I see, because the customer's in Seward, is that it? Right, the customer's product is in Seward. So it needs, okay, and so then barges would call at Anchorage? Yeah, shipping from Anchorage, right? Anchorage is a deeper water port. Is it going to be at Sampson? No, it's not Sampson. I don't believe it at Sampson, it's somebody else. All right, okay, all right. I'm sorry, do you have any other points you want to make? No, Your Honor, unless there's any other questions. Unless the panel has anything further. Okay, well we will, the case has already been submitted, and we will get you a decision as soon as we can puzzle our way through this one. Thank you very much. Thank you very much.
judges: Tashima, Tallman, Smith